Hull *v.* Sigsworth.

———————— ◆ ————————

48  258
74  149

ALFRED G. HULL, TRUSTEE, *vs.* WILLIAM SIGSWORTH.

The defendant, who was in the employment of *M* upon his farm, bargained with him for the purchase of a horse which *M* had for some time owned and kept on the farm, when he should have earned the money to pay for it. The horse remained on the farm as before, and two years after *M* sold it to the defendant, taking his receipt in full for wages earned in payment. The horse still remained on the farm and was kept in *M's* stable, the defendant continuing in his service, and feeding it from *M's,* hay and grain as before paying a certa um per week for its keeping. The defendant took exclu-sive care of the horse, breaking it to harness, and keeping it shod, and claiming to own and be in possession of it. About two months after the sale the horse was attached by one of *M's* creditors. Held, that there had been no such change of possession as made the sale good against the creditors of *M.*

Where a trustee in insolvency sues, it is not sufficient to describe himself in the writ merely as trus , but he should state the character of the assignment and the name of the assignor.

REPLEVIN for a horse ; brought to the Court of Common Pleas for New Haven County. The following facts were found by the court.

The horse in question, now four years old, was bred and owned by Rev. Wm. H. H. Murray, up to the 15th day of May, 1879, and was always kept on his stock-farm in Guilford.

About two years previous to that date, Sigsworth the defendant, then in the employ of Mr. Murray (and ever since up to the time of the purchase hereinafter mentioned,) bargained with him to purchase the horse, then a colt, as soon as he should earn money enough in Mr. Murray's employ to pay for it.

On the 15th of May, 1879, the wages of Sigsworth had amounted to $250, and Mr. Murray, in performance of the agreement, sold the horse to him for that sum, and delivered it with a bill of sale to Sigsworth, and thereupon Sigsworth gave to Mr. Murray a receipt in full for the amount then due him as aforesaid. The transaction was open and in good faith, and not with any view to insolvency or for the purpose of defrauding any creditors, and there was no evidence that Mr. Murray was at that time indebted or embarrassed.

After the purchase Sigsworth bargained with Mr. Murray to permit him to keep the horse at the latter's stable, in the same manner as he had been theretofore kept, and to be fed from Mr. Murray's grain and hay at the rate of $2.50 per week, but to be at all times under the control of Sigsworth. The horse was then unbroken and had never been personally handled by Mr. Murray, nor used by any one, but had been taken care of by his employees in the same manner as the other stock. Sigsworth at this time made an arrangement with Mr. Murray to stay with him until the close of the haying season and work for him, doing farm work and taking care of stock in the same manner as he had before ; and it was agreed that the price of the keeping of the horse should be taken out of his wages when they settled. Sigsworth continued to work for Mr. Murray on these terms during the remainder of the season and until all the prop-

erty came into the hands of the trustee. He kept the horse in his barns until it was attached, and took exclusive care of it himself, and broke it to harness, and shod it himself, (he being a horse-shoer,) and always claimed to own and be in possession of it. Except as here stated, there was no apparent public change in the ownership or custody of the horse.

Sigsworth intended at the close of the season to remove the horse to his own house, at Prince Edward's Island, and to have its keeping taken out of his wages at the close of the season. Mr. Murray, during all this time, was keeping a large and extensive stock-farm, with stables and barns, and was boarding a number of horses for other persons, as well as a great number of his own horses; and such horses were all kept in the same manner without any apparent distinction. The horse in question was born on Mr. Murray's farm from a sire and dam owned by him, but after the sale he never claimed this horse or exercised any control over it.

Mr. Murray spent but little time on his place at Guilford, where his farm and stables were. About June 14th, 1879, he left the place and the state, and has never since returned or exercised any personal control over any of the property nor given any direction concerning it. In the latter part of July, 1879, all of his personal property, including this horse, was attached and taken away by sheriffs, and this horse remained in the custody of officers until October, 1879, when it was delivered by the officers to the plaintiff, as trustee of Mr. Murray's estate in insolvency. It remained in the custody of the plaintiff until February, 1880, when the defendant took possession of it under a claim of right for the purpose of compelling the trustee to replevy it if he claimed it as a part of Mr. Murray's estate.

At the time the horse was attached the defendant was present and objected to its being taken, and claimed to be the owner and in possession of the horse, and has ever since asserted his title, but did not bring a replevin suit because he was poor and unable to give a proper replevin bond.

Prior to May 15th, 1879, Mr. Murray had not in fact suf-

ficient available assets, other than certain patent rights, to meet his obligations, but this fact was not known to Sigsworth or the public at the time of the sale; and at that date Mr. Murray owned certain patent rights from the sale of which he expected to be able to meet all of his obligations and save his stock-farm and other personal property clear of indebtedness.

Upon these facts the case was reserved for the advice of this court.

*L. Harrison,* for the plaintiff, cited *Swift* v. *Thompson,* 9 Conn., 63; *Osborne* v. *Tuller,* 14 id., 529; *Kirtland* v. *Snow,* 20 id., 28; *Webster* v. *Peck,* 31 id., 500; *Norton* v. *Doolittle,* 32 id., 410; *Bird* v. *Andrews,* 40 id., 542; *Hatstat* v. *Blakeslee,* 41 id., 301; *Seymour* v. *O'Keefe,* 44 id., 130.

*H. B. Munson,* for the defendant.

1. The defendant, on the 15th day of May, 1879, consummated a bargain which he had made two years previously, and purchased this horse with his earnings. He acquired the legal title, by a proper bill of sale, and by an actual delivery of the horse. He paid the full value, $250, and all was done openly and in good faith. His title thus acquired was complete and perfect against Murray, the original owner, and against the whole world. The conduct of both parties after the sale was perfectly consistent with the sale. Murray was not to have any use of or control over the horse after the sale; and did not have. His estate was to receive the benefit of Sigsworth's labor for keeping the horse, and did receive it at the rate of $2.50 per week. Sigsworth, not Murray, was to keep the horse at Murray's stable, at all times under his own control. Sigsworth kept the horse in Murray's barn until it was attached, and took exclusive care of it himself, and broke, and shod, and drove the horse, and always claimed to own and be in possession of it. On the 14th of June Murray left the state and abandoned all connection with his farm and personal property. Sigsworth was there with his horse, having the sole charge of it in his own behalf all

of this time (nearly two months), and neither Murray nor any servant or agent in his behalf from that time to the time of attachment had anything to do with it. And when the officers came to attach the horse Sigsworth was in the actual possession—there present—"claiming to be the owner and in possession of it." Possession of personal property is presumed to be in the owner unless the contrary appears. *Haight* v. *Turner*, 21 Conn., 593, 597. If the owner is close by, where the horse is under his eye and control, it is sufficient. As between Sigsworth present, asserting his ownership and possession, and Murray absent and a thousand miles away, it is absurd to say that the "eye of the law" could see Murray then in possession, because he held the invisible title to the boarding stable, which he had abandoned, and could not perceive Sigsworth, who was then present asserting ownership and possession, and the only person who had anything to do with the care, custody and control of the horse. The "visible possession" was clearly in Sigsworth, and this alone at the time of the attachment was sufficient. *Hall* v. *Gaylor*, 37 Conn., 553. The circumstances of this case are peculiar, and strikingly unlike those of any case where a sale has been held constructively fraudulent, from *Twyne's case* in 1601 to the present time. In *Mead* v. *Noyes*, 44 Conn., 492, the court say—"Whom would a stranger have considered in possession in this case?" We say he would have seen the vendee breaking and shoeing this colt as his own. He would have seen him feeding the horse and taking the exclusive care of it and using it exclusively and for his own purposes. He would have seen these acts repeated and continued down to the time of the attachment. He would have seen that neither the vendor nor any other person had the slightest care, control or use of the horse after Sigsworth bought him. He would have seen Sigsworth working on the farm, in the hay and harvest field, paying for his horse's board, and trying to earn money enough to pay his way home with his horse. None of these circumstances ever occurred before the sale with reference to this horse, and not with reference to any other horse or stable on the

premises. When the sheriff came to attach the horse, the "stranger" would have seen this laboring man standing by his horse, asserting his title and exclusive possession, and would have seen that no one else was in fact in possession of the horse or stable, or claimed to be, and he would have been put upon inquiry as much as though he had found a watch hanging in Sigsworth's bed-room in Murray's house, which Sigsworth had bought and paid for, before Murray abandoned the place, and which he had repaired, possessed and used ever since. The case at bar is widely different from that of *Norton* v. *Doolittle*, 32 Conn., 410. In that case the sale was secret. "The property was returned to the same apparent use and enjoyment as before." The only similarity to the case of *Mead* v. *Noyes* is the fact that the horse was kept in the same barn where he was kept before the purchase, and fed upon the hay and grain of Murray paid for by Sigsworth; but with this marked difference, that Murray had abandoned the place and all his property, and there was no one in charge of this stable and horse but the defendant, and had not been for more than six weeks. And there was good reason for this; it was the most convenient and natural place to keep the horse when Sigsworth had finished his day's work for Murray, especially as he was breaking him by frequent use. That case does not decide that the fact of keeping the horse in the same place after the purchase as before is constructively fraudulent, but that this fact combined with the other peculiar accompanying circumstances rendered the sale void; not one of those facts is in this case, but in their stead every positive circumstance shows this sale to be beyond suspicion of fraud, either actual or constructive. There was no common occupancy of the stable where this horse was kept; no one but the vendee ever stepped into it after he bought the horse. This point was directly decided in *Potter* v. *Mather*, 24 Conn., 554. HINMAN, J., says: "It appears to us a man may have exclusive possession of personal property which is upon land occupied by him and another in common." In that case the wagon was left in the same place after the sale as before, and the purchaser had never used it but once. In

*Kirtland* v. *Snow*, 20 Conn., 28, HINMAN, J., says: "The *mala fides* upon which the case turns is the trust which entered into the sale for the benefit of the vendor. The rule is founded upon the presumption that the purchaser will naturally perfect his purchase by taking possession. The enjoyment of the thing purchased is generally, if not always, the object the purchaser has in view, and his neglect therefore to take possession is so unusual and contrary to general experience as to be very strong evidence that the purchase was not real." In this case, the conduct of both vendor and vendee was consistent with a bonâ fide sale. No reasonable man situated as Sigsworth was would have conducted differently. BISSELL, J., in *Talcott* v. *Wilcox*, 9 Conn., 134, 140, says: "There was an effected change of property, the sale was open and notorious, and there is nothing unusual in the tenant having possession of the stock of his landlord." So also in *Bird* v. *Andrews*, 40 Conn., 542, the vendor became the clerk and was "visibly" in possession, selling the same goods as clerk of which he had before been the proprietor. In all of these cases the goods went back to the same place. The visible appearance of a change in that case was far less marked than in the case at bar. In *McKee* v. *Garcelon*, 60 Maine, 167, the court say:—"It will be found exceedingly difficult, if not absolutely impossible, to lay down a general rule applicable to all cases. There must be such evidence arising from the conduct of the parties, as shows a relinquishment of the ownership and possession of the property by the vendor and an assumption of these by the vendee." We have both the relinquishment and assumption of ownership in this case. In *Stephenson* v. *Clarke*, 20 Verm., 624, the court say that the change of possession necessary is only such a divesting of the possession of the vendor as any man knowing the facts, as they could be ascertained upon reasonable inquiry, would be bound to understand was the result of a change of ownership. See also *Flanagan* v. *Wood*, 33 Verm., 339; *Ridout* v. *Burton*, 27 id., 383; *Allen* v. *Knowlton*, 47 id., 512; *Ingalls* v. *Herrick*, 108 Mass., 351; *Farrar* v. *Smith*, 64 Maine, 74, 78; *Kidd* v. *Rawlinson*, 2 Bos. & Pul., 59; *Jezeph*

v. *Ingram*, 1 J. B. Moore, 189. In all of these cases the property was kept at the same place after the sale as before, and the sales were held to be valid. To defeat the defendant's title to this horse, which he acquired in perfect good faith, and whose value he increased after he purchased it; will require the extension beyond all precedent of that ancient and cast-iron rule of a supposed public policy, which in order to prevent the people from practicing frauds, requires the courts to decide that a just and honest sale is false and fraudulent. That rule in England, where it originated, has been almost done away with, and so modified as to protect an honest purchaser. Massachusetts and Maine and almost every other state but Connecticut and Vermont has followed that example.

2. Aside from the merits of the case, the plaintiff can not recover upon his declaration, as he alleges only that he is trustee, without stating the character of the trust nor the name of the assignor in insolvency. He can not stand upon such a title against this defendant, whose title is clearly good against all the world, and in case of a retention of possession by the vendor would be good against all but the creditors of the vendor. The plaintiff merely as trustee does not represent the vendor's creditors, nor anybody else.

PARDEE, J. It is found that Rev. William H. H. Murray owned and kept the horse upon his farm for three years prior to May, 1879; that in 1877 the defendant then in his service bargained with him for the purchase of it as soon as he should earn the money to pay for it; that in May, 1879, Murray sold and delivered the horse to him, taking his receipt in full for wages earned in payment; that thereafter he continued in the service of Murray, keeping the horse in his stable and feeding it from his hay and grain as before, paying Murray two dollars and a half per week for the hay and grain; that he took exclusive care of it, broke it to harness and shod it, claiming to own and be in possession of it; and that while so kept it was attached as the property of Murray;

and that subsequently the defendant took possession of it under the claim of ownership.

Upon this finding we have the continued ownership and use of the premises by the vendor; the continued employment thereon of the vendee as his servant; the continued care by the latter of the horse, with others belonging to his employer, feeding all from the stock of hay and grain belonging to him. To the world all things remained unchanged, and it might well be presumed that the continued acts of feeding, shoeing and training, subsequent to the sale, were a part of the duties incident to the continued service. The case of the vendee is not strengthened by the fact that at the time of the attachment the vendor was, and during several weeks prior thereto had been, absent from his farm; his ownership and use continued; the vendee remained the servant of an absent master; there was no visible change in the relation of each to the other; nor in that of either to the property, real or personal. And the declarations of ownership by the vendee, including that made at the time of the attachment, must go for nothing, because the apparently unchanged ownership by the vendor was a constant denial of their truth, and as a matter of law bore them down. So must also his good faith, for in the presence of the facts found the law will not consider it.

In *Norton* v. *Doolittle*, 31 Conn., 405, this court said:— "The rule of law which requires a change of possession is one of policy. Its object is the prevention of fraud. * * The policy which dictates it, and the prevention at which it aims, require its rigid application to every case where there has not been an actual, visible, and continued change of possession. * * And as in applying the rule we must look beyond the good faith, or the secret, technical features of the transaction, so purchasers must learn and understand that if they purchase property and without legal excuse permit the possession to remain, in fact, or apparently and visibly, the same, or if changed for a brief period, to be in fact or apparently and visibly continued as before the sale, they hazard its loss by attachment for the debts of the

vendor, as still, to the view of the world, and in the eye of the law, as it looks to the rights of creditors and the prevention of fraud, his property."

The case of *Elmer* v. *Welch*, 47 Conn., 56, had not been published when this case was argued, and therefore was not cited by the counsel on either side. We now refer to it only that it may be understood that it has not been overlooked by us in the determination of this case. The facts of that case were in many respects like those of this, but there was this all-important fact there which does not exist here, and which was decisive of the case in favor of the vendee—that the real estate, with the barn in which the horse that had been sold was kept, was conveyed, at the time of the sale of the horse, by the vendor to the vendee, and was at the time of the attachment of the horse by a creditor of the vendee in the exclusive possession of the vendee, although the horse was taken care of by the same persons previously in the employment of the vendor, and in part by the vendor himself. The deed of the premises had been duly recorded, and the grantee was in open and exclusive possession of them.

In his writ the plaintiff describes himself as trustee, without naming his assignor in insolvency or stating the character of the assignment. We advise the Court of Common Pleas to render judgment for the plaintiff upon his amendment of the writ in this respect.

In this opinion the other judges concurred.