## In re COLONIAL MILL & LUMBER CO.

(District Court, D. Connecticut. July 16, 1914.)

No. 3027.

BANKRUPTCY (§ 184*)—TRANSFERS—VALIDITY UNDER STATE LAW.

Claimant furnished lumber to a corporation, which was the sales agent of the bankrupt. The corporation turned the lumber over to the bankrupt to use in its manufacturing business, and claimant being unable to procure payment because of the corporation's financial condition, it was arranged that claimant should order certain columns from the corporation to be delivered in settlement of the claim for lumber. Claimant ordered 200 columns, which the corporation ordered the bankrupt to manufacture and hold for delivery at claimant's order. The columns were made, charged to the corporation by the bankrupt, and in turn charged to claimant, but, with the exception of 55, were held by the bankrupt awaiting claimant's shipping orders, without marks of any kind to indicate the passing of title until they were attached at the bankrupt's plant as its property. Held, that the transfer as to the columns retained was fraudulent in law, under Connecticut Sales Act (Pub. Acts 1907, c. 212) § 26, providing that when a person having sold goods continues in possession thereof, and such possession is fraudulent in fact, or is deemed fraudulent in law, creditors of the seller may treat the sale as void, and hence claimant was not entitled to recover possession from the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 275–277; Dec. Dig. § 184.*]

In Bankruptcy. In the matter of bankruptcy proceedings of the Colonial Mill & Lumber Company. Application by the Hotchkiss Bros. Company for the delivery of certain wooden columns in the custody of the trustee, alleged to belong to claimant. Petition to review a referee's order denying the claim. Affirmed.

Walsh & Hubbell, of Norwalk, Conn., for petitioner.
Keogh & Candee, of South Norwalk, Conn., for trustee.

THOMAS, District Judge. The Hotchkiss Bros. Company presented its petition to the referee, wherein it claimed title and possession to 145 wooden columns in the custody of the trustee, which were inventoried as a part of the bankrupt corporation's estate. The referee, after hearing had upon said petition, denied the same, and the matter is now before the court on petition for review of the referee's finding and order.

The evidence discloses that the Colonial Mill & Lumber Company, the bankrupt, a corporation organized under the laws of the state of New York, was engaged in business in South Norwalk, Conn., where it maintained a mill and plant for the manufacture of wooden columns, while the Colonial Column Company, also a corporation organized under the laws of the state of New York, was engaged in business in New York City, making sale of columns which were manufactured by the bankrupt corporation at its South Norwalk plant. Both corporations were controlled by practically the same interests; one Charles

V. D. Peak of Winsted, Conn., being the secretary and treasurer of each of the corporations.

To avoid confusion, the Colonial Mill & Lumber Company, bankrupt, will be referred to as the South Norwalk company and the Colonial Column Company as the New York company.

The New York company took practically the entire output of the bankrupt corporation's mill, although the South Norwalk company was allowed to fill orders for mill work in South Norwalk, and a large portion of the material used by the bankrupt corporation in its mill was bought by the New York company and shipped in its name to the bankrupt's plant. Where the stock came from which was used to make the columns now in dispute, by whom it was shipped, or in whose name received is not, however, shown by the evidence.

The Hotchkiss Bros. Company made two shipments of lumber to the South Norwalk mill on the order of the New York company, to whom it charged the same, one shipment being sent in December, 1910, and the other in January, 1911. On July 11, 1911, the New York company owed the petitioner something over $500 on account of these shipments, but was unable to pay it. In order to reduce this indebtedness the New York company agreed to manufacture for the Hotchkiss Bros. Company 200 8"x8' columns at $2.10 each, and to set them aside as the property of the Hotchkiss Bros. Company and hold the same awaiting shipping orders, with the understanding that it would receive credit on its own account with Hotchkiss Bros. Company for the sum of $420 when the columns would be completed. The New York company shortly after directed the bankrupt corporation to manufacture the 200 columns for the Hotchkiss Bros. Company and hold them for that company until shipping instructions would be received from the New York company.

The bankrupt corporation undertook immediately to manufacture the columns, so that on September 7, 1911, the New York company was able to and did write Hotchkiss Bros. Company that 160 of the columns had been completed and were ready for shipment and made request for shipping directions. Four days later the New York company notified the petitioner by letter that the 200 columns ordered were ready and would be shipped upon receipt of instructions from them. An invoice of the entire order of 200 columns was inclosed in the same letter to Hotchkiss Bros. Company, and the New York company charged Hotchkiss Bros. Company upon its own books with $420, and the latter in turn gave credit to the New York company for a like sum on the lumber shipment accounts.

In accordance with the method of dealing which existed between the South Norwalk company and the New York company (and that method applied in this case), when articles were manufactured and shipped from the mill, they were charged at cost of manufacture on the books of the South Norwalk company to the New York company, and it in turn gave credit upon its books for the cost price to the account of the South Norwalk company. The invoices were then sent to customers by the New York company, and, when it received payment for the same, it would in turn make payment to the South Norwalk com-

pany. The method adopted, however, was purely a bookkeeping arrangement, the books of both concerns being kept in the office in New York City. All bills, however, sent to purchasers indicated that the indebtedness was due to the New York company.

Of the order of 200 columns made up for the Hotchkiss Bros. Company, only 55 were shipped prior to attachments which were placed upon the plant of the South Norwalk company a short time before its adjudication in bankruptcy, which was on December 31, 1912, so that 145 of the columns were at that time in the mill where they had been stored on the second floor, awaiting shipping orders. They were not, however, labeled or tagged, nor was anything further done to them, so far as physical appearances were concerned, to indicate that they were the property of the Hotchkiss Bros. Company or of any person other than the bankrupt concern. When the trustee was appointed on January 24, 1913, he had them inventoried as part of the bankrupt's estate, and he now holds possession of them as trustee.

So far as appears, the bankrupt never had any dealings with the Hotchkiss Bros. Company, all transactions of the latter concern being had solely with the New York company through correspondence with its New York office; and, in the matter of the setting aside of the columns with a view of protecting it in its ownership thereto, the Hotchkiss Bros. Company left the same in the hands of the New York company. It would seem that no officer or agent of the Hotchkiss Bros. Company had ever inspected or ever attempted to take possession of, or in any other way exercise dominion over, the 145 remaining columns after they had been completed. No evidence was introduced to indicate that the Hotchkiss Bros. Company knew of the exact location of the bankrupt corporation's mill or where the columns were actually located.

The facts in the case are undisputed in so far as the leaving of the 145 columns on the second floor of the South Norwalk mill is concerned. The petitioner says, however, that because it never had any direct business transactions with the bankrupt corporation, and had dealt only with the New York company, therefore the relationship of vendor and vendee did not exist between the petitioner and the bankrupt corporation, and the mere fact that the 145 columns were allowed to remain in the mill should not be held a sufficient cause to deprive the petitioner of its right to title and possession of the columns. In other words, its claim is that the Connecticut rule, which is applied to cases where a vendor retains possession of personal property after a sale thereof, should not be applied in this case, as the cost of stock and expense of manufacturing the columns were paid by the New York company crediting the account of the bankrupt corporation with the cost of the columns a long time before attachments were brought or bankruptcy proceedings commenced; that the New York company was its vendor, and that there was in fact a complete and valid delivery of the columns into petitioner's possession when the New York company had them set aside in the bankrupt's mill awaiting the convenience of the petitioner as to shipment. And petitioner quotes, in support of its contention, rule 2 of section 19, c. 212, of the Public Acts

of the state of Connecticut, passed in 1907, otherwise known as the "Connecticut Sales Act," which reads:

"Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done."

The rule which petitioner quotes can, however, throw no appreciable light upon the main point in this case, as it evidently was intended for no other purpose than to show that the buyer, under ordinary circumstances, is expected to be ready to take over manufactured articles upon their completion. However, if this rule does in fact have any bearing upon the case, when one takes into consideration section 26 of the same act, which reads:

"Where a person having sold goods continues in possession of the goods, or of negotiable documents of title to the goods, and such retention of possession is fraudulent in fact, or is deemed fraudulent under any rule of law, a creditor or creditors of the seller may treat the sale as void"

—it will readily be seen that, by the adoption of the Sales Act, it was not intended to change the law of Connecticut relative to the retention of possession of personal property by a vendor.

There is a question as to what was the actual relationship existing between the New York company and the South Norwalk company, but whether the New York company occupied the position of an agent for the South Norwalk company in making the sale of the columns to the Hotchkiss Bros. Company (in which event the South Norwalk company was an undisclosed principal), or whether the New York company was in fact a vendee to whom the South Norwalk company sold the columns which it manufactured for the use of the Hotchkiss Bros. Company, is immaterial, as the result in this case must be the same in either event.

If the New York company was merely the agent of the South Norwalk company, then the South Norwalk company, as the undisclosed principal, was the actual vendor to the Hotchkiss Bros. Company, while, on the other hand, if the New York company was the actual purchaser of the columns from the South Norwalk company, and in turn sold them to the Hotchkiss Bros. Company, the South Norwalk company occupied the position of vendor to the New York company. So we find that the South Norwalk company was the vendor of the 145 columns which it was holding awaiting shipping orders from the New York company when the attachments were made and bankruptcy proceedings begun, even though the Hotchkiss Bros. Company knew only the New York company in the transaction and supposed that it occupied the position of a vendor of lumber to the New York company in the first instance, and as a purchaser of the 200 columns from that corporation in the second instance.

Whether there has been a change of possession of personal property following a sale in any case, so that the sale will be valid as against the creditors of the vendor, is a mixed question of law and fact. After the facts are ascertained, the law determines whether or not there has been a change of possession. Mead v. Noyes, 44 Conn. 489.

So that the court is now called upon to apply to the facts in this case that rule of law which seems best suited to the occasion, and in discharging this duty the court must be guided by the decisions of the highest court of Connecticut.

At the outset it becomes necessary to observe that there has been no rule of law more clearly expressed or more closely adhered to by the courts of Connecticut than in those cases where the vendor of personal property is permitted to remain in possession thereof, after sale made. This fact in itself is held to be such evidence of fraud, as against an attaching creditor of the vendor, that, unless there is a legal excuse shown to and approved by the court, the evidence becomes so conclusive that no amount of good faith on the part of the parties to the transaction will be sufficient to overcome the presumption of fraud. Greenthal v. Lincoln Seyms & Co. et al., 68 Conn. 384, 36 Atl. 813; Patchin v. Rowell, 86 Conn. 372, 85 Atl. 511.

It is not enough that there was a formal change of possession of the property accompanying the sale, as the law requires an open, visible, and permanent change of possession to make the sale good as against the vendor's creditors, except in those cases for which the law has specially provided. While the vendee may be in possession of property as between himself and the vendor, still his possession may not be sufficient to protect the property from the vendor's creditors. The rule which requires the vendee of personal property to take and retain the possession of it in order to protect it from the vendor's creditors is a rule of policy as well as of evidence, and was extended from a mere rule of evidence calling it a "badge of fraud" only, and arbitrarily declared a matter of law, so that it renders the sale void as to creditors, notwithstanding the highest evidence of the honesty of the sale, because it has been thought better to take away the temptation to practice fraud than to incur the dangers arising from the facility with which testimony may be manufactured to show that the sale was honest.

Our courts have said over and over again that:

"The policy which dictates it (the rule) and the prevention at which it aims require its rigid application to every case where there has not been an actual, visible, and continued change of possession." Norton v. Doolittle, 32 Conn. 410.

In the application of the rule the court must look beyond the good faith of the parties, or the secret technical features of the transaction, so that "purchasers must learn and understand that if they purchase property and, without a legal excuse, permit the possession to remain in fact or apparently and visibly the same, or, if changed for a brief period, to be in fact or apparently and visibly restored, and thereafter in fact or apparently and visibly continued as before the sale, they hazard its loss by attachment for the debts of the vendor, as still, to the view of the world and in the eye of the law, as it looks to the rights of creditors and the prevention of fraud," it is still the vendor's property. Norton v. Doolittle, 32 Conn. 411; Kirtland v. Snow, 20 Conn. 23; Mead v. Noyes, supra; Hull v. Sigsworth, 48 Conn. 266, 40 Am. Rep. 167.

Applying this rule to the case in question, it is clear that there was not such an open, visible, and continued change of the possession of the columns as the law requires in order to have protected the petitioner's title thereto against either the attaching creditors or the trustee in bankruptcy.

In arriving at this conclusion, the court is not unmindful of the equities which the facts of the case disclose in behalf of the petitioner, but there have been other cases in which the same rule was applied where the equities were equally as strong, if not stronger, than in the present case. Take for instance the cases of Hull v. Sigsworth, 48 Conn. 258, 40 Am. Rep. 167, and Shaw v. Smith, 48 Conn. at page 306, 40 Am. Rep. 170; in the first of these cases the defendant was a farm hand and paying his employer, by a receipt for wages earned on the farm, $250 for a horse purchased by him from his employer. After taking possession of the horse, he still continued to work on the farm for the vendor, keeping the horse in the stable thereon, where it had been kept by his employer for some two years prior to the sale, and feeding it from his employer's hay and grain, for which he paid a weekly allowance to the vendor out of his wages; the defendant exercised exclusive care of the horse, which was an unbroken colt, and broke it to harness, kept it shod, and at all times after the sale the defendant claimed to own and be in possession of it. About two months after the sale, the horse was attached by one of the creditors of the vendor. Nevertheless, in rendering a decision against the defendant, the Supreme Court of Connecticut, after referring to the continued use of the premises by the vendor, and the continued employment thereon of the vendee as his servant, the feeding by the latter of the horse from the stock of grain and hay belonging to his employer, has made use of the expression at page 266 of 48 Conn. (40 Am. Rep. 167) that:

"To the world all things remained unchanged, and it might well be presumed that the continued acts of feeding, shoeing, and training, subsequent to the sale, were a part of the duties incident to the continued service."

Further along in the opinion of the case it is stated:

"There was no visible change in the relation of each to the other; nor in that of either to the property."

And:

"The declarations of ownership by the vendee, including that made at the time of the attachment, must go for nothing, because the apparently unchanged ownership by the vendor was a constant denial of their truth, and as a matter of law bore them down. So must also his good faith, for, in the presence of the facts found, the law will not consider it."

The case of Shaw v. Smith was one where a party agreed to make for plaintiffs, for a specified sum, a complete set of special tools, suitable only to the manufacture of a certain make of sewing machine; payments to be made as the work progressed. When the maker had completed a part of the set of tools, and another part was nearly completed, and still another part was in the rough, he became insolvent and made an assignment of his property to the defendant for the benefit of his creditors. At the time of the assignment, the plaintiffs had paid the makers $5,000 which was the entire contract price, although none

of the tools had in fact been delivered into their possession, the last payment being one of $500, and procured from them by the maker fraudulently representing that the entire set of tools was substantially completed. The plaintiffs having brought replevin for the tools against the maker's trustee in insolvency, and the case being reserved for the advice of the Supreme Court, it was held that where parties agree that the title to chattels shall at once vest in the buyer, and the sale be complete as between the parties, yet the retention of possession by the vendor of chattels leaves them open to attachment by the creditors of the latter, and that notwithstanding the maker of the tools in question did fraudulently represent to the buyers that the tools were substantially complete and ready for delivery, and that the buyers, trusting in the maker's representations, paid the balance of the contract price, still the plaintiffs were not entitled to judgment, as there was no such delivery of the chattels nor possession of them by the plaintiffs as would answer the law, which requires a change of possession in order to make a sale of chattels good, as against creditors of a vendor.

Then, too, from another viewpoint of the present case, one could easily get the idea that, when ordering the columns to be manufactured, the petitioner was not altogether actuated by altruistic motives, but, on the contrary, thought by that method to secure to itself something valuable as an offset to its claim with a concern which it believed to be in a shaky financial condition, and a reading of the correspondence which forms part of the evidence tends largely to confirm such idea. While no exception can be taken to petitioner's endeavor to obtain a settlement of its claim, one cannot help but marvel at the fact that the petitioner, a Connecticut corporation, engaged in business in Torrington, in this state, did not at the time take the precaution to obtain the advice of some Connecticut attorney as to what the law required of a vendor and vendee of personal property, instead of depending, as it did, upon the New York company to advise and protect it in the premises. By then neglecting to ascertain the requirements of the law in this respect, and by allowing the columns to remain in the possession of the bankrupt corporation for over a year after it knew of their completion, the petitioner was guilty of such laches as modify very materially any equities otherwise existing in its favor. The position in which the petitioner now finds itself is of its own making, and its loss is directly due to its failure to take the property out of the bankrupt corporation's possession into its own.

In view of the circumstances in the case and of the law as the court views it, the referee, by his finding and order, wherein he denied the petitioner's claim to the title and possession of the 145 columns held by the trustee in bankruptcy as part of the bankrupt's estate, committed no error, and the same is affirmed.

Decree accordingly.